UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pacifique Gahamanyi,

                Petitioner,

    vs.                         REPORT AND RECOMMENDATION

Scott Baniecke,

                Respondent.      Civ. No. 07-4007 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(B), upon the Petition of Pacifique Gahamanyi ("Gahamanyi") for a Writ of Habeas Corpus under Title 28 U.S.C. §2241.  Gahamanyi appears <u>pro se</u>, and the Respondent appears by Friedrich A. P. Siekert, Assistant United States Attorney.

For reasons which follow, we recommend that the Petition for a Writ of Habeas Corpus be denied.

## II.  Facts and Procedural Background[1]

Gahamanyi, a native of Burundi and a citizen of Rwanda, is currently being detained by Federal immigration authorities at the Sherburne County Jail, in Elk River, Minnesota.  Gahamanyi entered the United States on November 26, 1998, as a nonimmigrant visitor with permission to remain for six (6) months.   See, Administrative Record ("A.R."), Docket No. 10, at 6; see generally, Immigration and Nationality Act ("INA") §101(a)(15)(B), Title 8 U.S.C. §1101(a)(15)(B). He violated his nonimmigrant status by remaining in the United States longer than permitted.  Id. On August 13, 1999, the INS issued a Notice to Appear to Gahamanyi for removal proceedings, based upon his violation of the conditions of his visa.  Id. at 6-7; see also, INA §237(a)(1)(B), Title 8 U.S.C. §1227(a)(1)(B).

On February 1, 2000, Gahamanyi appeared before the IJ for his Removal Hearing.  Id. at 22.  At the Hearing, Gahamanyi admitted that he had stayed longer than permitted, and conceded that he was removable.  Id.  To avoid removal, Gahamanyi applied for asylum under INA §208, Title 8 U.S.C. §1158, which allows

---

[1]Our factual and procedural history is largely drawn from the Administrative Record submitted by the Respondents in support of their Responsive Memorandum. See, Administrative Record ("A.R."), Docket No. 10; Response to Petition, Docket No. 11.  We have also reviewed, and considered, the exhibits and documents submitted by Gahamanyi, in support of his Petition, and will cite to them accordingly.

the Attorney General to grant asylum to applicants who prove a refugee status based, in part, on a well-founded fear of persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion.  See, <u>A.R.</u>, supra at 8-18; see also, <u>INA §208(b)(1)(B)(i), Title 8 U.S.C. §1158(b)(1)(B)(i)</u>.

An applicant's testimony may be sufficient to prove refugee status if the trier of fact makes a favorable determination of the applicant's credibility.  See, <u>INA §208(b)(1)(B)(ii), (iii), Title 8 U.S.C. §1158(b)(1)(B)(ii), (iii)</u>.  In addition to his application for asylum, Gahamanyi concurrently applied for withholding of removal, see, <u>INA §241(b)(3), Title 8 U.S.C. §1231(b)(3)</u>, alleging, pursuant to the United Nations Convention against Torture, that he would more likely than not be tortured if removed to Rwanda.  See, <u>A.R.</u>, supra at 8-17; see also, <u>Title 8 C.F.R. §§208.16(c), 208.18</u>.  As with an application for asylum, the applicant bears the burden of proof in an application for withholding of removal, though his or her testimony may be sufficient proof if deemed credible.  See, <u>Title 8 C.F.R. §208.18(c)(2)</u>.

In support of those applications, Gahamanyi alleged that he had a well-founded fear of future persecution based on his mixed ethnicity of Tutsi and Hutu.  See, <u>A.R.</u>, supra at 24.  More specifically, Gahamanyi testified that his father, who was Hutu, and all of his siblings, had been killed during the mass genocide in Rwanda, and that his

father had been killed by Hutu extremists, because of his membership in the Liberal Party, which opposed the then-seated Hutu government, and because of his marriage to a Tutsi.[2]  Id.  Gahamanyi testified that his family had been targeted because of its mixed ethnicity, and he testified that he was also a member of the Liberal Party.  Id. at 25.

Between 1994 and 1996, Gahamanyi sought refuge from persecution, by the Hutu extremists, and the newly-installed Tutsi military regime, by living in the savannah of the jungle, in the home of a religious order, and in several refugee camps. Id. at 25-26.  At one point, Gahamanyi was detained for more than two (2) hours, while traveling, when government officials "suspected that he was a member of a political party opposed to the [Rwandan Patriotic Front ("RPF")] government," which was the Tutsi military regime that had taken power.  Id. at 26.  In 1997, while living with his father's friend, Gahamanyi traveled to Uganda, Burundi, and the United States on business, before returning to Rwanda.  Id. at 27.

Thereafter, in June of 1998, Gahamanyi received threatening flyers from Hutu extremists and, in July of 1998, Gahamanyi was wrongfully arrested and imprisoned by the RPF military, for approximately one (1) month.  Id. at 27-28.  Gahamanyi

---

[2]Gahamanyi's mother died of natural causes in 1990.  See, A.R., supra at 83.

testified that many people were arrested around that time for questioning, both Hutus and Tutsis, and he was released after prison officials verified that neither he, nor his family, had participated in the Rwandan genocide.  Id. at 28.

Since he feared another arrest, Gahamanyi decided to leave Rwanda, which led to his acquisition of a nonimmigrant visitor visa to the United States.  Id.  At the time of his initial Removal Hearing, Gahamanyi had not been convicted of any crimes, and he had no remaining family in Rwanda, nor did he own any land there.  Id. at 28-29.  Gahamanyi testified that his father's family was living in Burundi, where he had attended school.  Id. at 29.  Gahamanyi also testified that he suffered permanent mental problems, due to the assassination of his family members, and his being beaten and malnourished during his imprisonment.  Id. at 30-31.  Gahamanyi further testified that he was afraid to return to Rwanda, because of the death threats he had received, and because of his membership in the Liberal Party.  Id. at 31.  Gahamanyi was then taking antidepressants to treat his Post-Traumatic Stress Disorder and Major Depression, which stemmed from his experiences during the Rwandan genocide.  Id. at 33.

The IJ found Gahamanyi's testimony to be credible, and further found that his testimony was corroborated by documentary evidence relating to the Rwandan

genocide. Id. at 38.  Accordingly, the IJ found that Gahamanyi had a well-founded fear of persecution, based upon his mixed ethnicity, and, on January 18, 2002, the IJ exercised his discretion to grant Gahamanyi's application for asylum. Id. at 41.  He did not reach Gahamanyi's applications for withholding of removal.  Id.  The Government did not appeal that determination. Id. at 128.

Thereafter, on January 17, 2007, the Government filed a Motion to Reopen the immigration proceeding, following Gahamanyi's subsequent conviction for Assault in the Second Degree.[3] Id. at 45; see, INA §208(c)(2), Title 8 U.S.C. §1158(c)(2) (providing that asylum may be terminated where "the alien meets a condition described in subsection (b)(2)"); INA §208(b)(2)(A)(ii), Title 8 U.S.C. §1158(b)(2) (A)(ii)(providing that asylum may be denied or terminated when "the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States").  By Order dated January 29, 2007, the IJ granted the Motion to Reopen, pursuant to Title 8 C.F.R. §1208.24(f), which allows an IJ to reopen a case "for the purpose of terminating a grant of asylum[.]" Id.

---

[3]On April 5, 2004, Gahamanyi was convicted by a Jury of felony Assault in the Second Degree, in violation of Minnesota Statutes Section 309.222, Subdivision 1, in the Hennepin County District Court. See, A.R., supra at 49, 80.  On July 26, 2005, the Minnesota Court of Appeals denied his appeal, and, on May 16, 2006, the Minnesota Supreme Court denied his Petition for Review. Id. at 49.

at 46.  The IJ observed that Gahamanyi conceded his final conviction for Assault in the Second Degree, which constituted a "particularly serious crime" under the INA, and which precluded his request for asylum.  Id. at 45-46, 81.

On February 14, 2007, Gahamanyi appeared before the IJ for a second Removal Hearing.  Id. at 47.  To avoid removal, Gahamanyi applied for a waiver of his inadmissibility, for an adjustment of his immigration status to permanent residency, and for withholding of removal.[4]  Id. at 51-58, 70; see, INA §209, Title 8 U.S.C. §1159 (waiver of inadmissibility); INA §245, Title 8 U.S.C. §1255 (adjustment of immigration status).  Under Section 209 of the INA, an alien can seek an adjustment of his status by demonstrating that he is admissible at the time of the adjustment.  See, INA §209(b)(5), Title 8 U.S.C. §1159(b)(5).  However, because Gahamanyi's conviction rendered him ineligible for admission, he had to seek a waiver of his inadmissibility, pursuant to INA §209(c), Title 8 U.S.C. §1159(c), either for humanitarian purposes, for family unity, or in the public interest.

---

[4]According to the Respondent, Gahamanyi married Cheryl Statton, a United States citizen, on June 8, 2006, see, A.R., supra at 70, while Gahamanyi's Application to Adjust Status identifies her as Cheryl Staton Gahamanyi.  Id. at 52.  For the sake of clarity, we refer to Gahamanyi's wife as "Staton."

At the Hearing, Gahamanyi testified that he had been living with Staton since 2003, in a home owned by Staton. Id. at 82. He also testified that he has one (1) child, who lives in Uganda, and to whom he occasionally sends money. Id. With respect to his conviction, according to Gahamanyi, a person named Salum Hadimana ("Hadimana") was holding his luggage in an apartment. Id. Gahamanyi tried to obtain police assistance to retrieve his luggage, but was unsuccessful. Id. Gahamanyi then went on his own to retrieve the luggage. Id. According to the criminal complaint, Gahamanyi demanded the return of the luggage, and then pulled a knife and threatened Hadimana. Id. at 86.

In his testimony, Gahamanyi denied harming or threatening Hadimana, and reiterated that he "is still afraid to return to Rwanda because both the RPF dominated government and militant Hutus may want to harm him," because of his mixed ethnicity. Id. at 83. Gahamanyi confirmed that he and Staton married after his conviction, and he confirmed that he had no other arrests in the United States. Id. at 83-84.

Staton testified that she was shocked when Gahamanyi was arrested, and that she had never seen him angry. Id. at 84. She also testified that she did not believe Gahamanyi had married her because of his immigration status, given his asylum

status.  Id. at 84-85.  Staton further testified that she was not sure if she would be able to accompany Gahamanyi to Rwanda, were he removed, because of her medical conditions.[5]  Id. at 85.

Ann Voskuil Staton ("Ann"), and Jennifer Arntz ("Arntz"), also testified on Gahamanyi's behalf.  Id.  Ann testified that she is Staton's sister-in-law, and that she sees Gahamanyi several times each year, dating back to 2003.  Id.  In her testimony, Ann described Gahamanyi as "polite in the extreme," and stated her belief that his conviction was a miscarriage of justice.  Id.  Arntz testified that she had become acquainted with Gahamanyi two (2) years earlier, through Staton.  Id.  Arntz attested that her son spends a great deal of time with Gahamanyi and Staton, and that Gahamanyi is a role model for her son.  Id.  She further attested that she had never seen Gahamanyi in an argument, or engaged in violent behavior.  Id.

In addition to the testimony of those witnesses, Gahamanyi offered a letter from his parole officer, who advised that Gahamanyi had completed his prison term for his assault conviction, and that he had been very cooperative and law-abiding throughout the course of his supervision.  Id. at 59.

---

[5]Gahamanyi submitted a letter from his wife's physician, who advised that Staton's medical conditions "would not be treatable in a third-world country."  A.R., supra at 89.

- 9 -

On March 15, 2007, the IJ granted Gahamanyi's application for a waiver of inadmissibility.  Id. at 60, 65, 79.  In his decision, the IJ found the testimony of Gahamanyi, and his witnesses, to be credible.  Id. at 90.  He concluded that Gahamanyi was entitled to a waiver of inadmissibility for humanitarian purposes, and to assure family unity.  Id. at 91.  The IJ acknowledged that the Attorney General required a showing of exceptional and extremely unusual hardship to justify a discretionary waiver, where an alien had committed a violent or dangerous crime.  Id., citing Matter of Jean, 23 I&N Dec. 373 (A.G., May 2, 2002), aff'd, 452 F.3d 392 (5th Cir. 2006) ("Aliens who have committed violent or dangerous crimes will not be granted a discretionary waiver to permit adjustment of status from refugee to lawful permanent resident pursuant to section 209(c) of the Act except in extraordinary circumstances, such as * * * cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship."); see also, INA §212, Title 8 U.S.C. §1182; Title 8 U.S.C. §212; Title 8 C.F.R. §212.7(d).

However, the IJ noted that Gahamanyi's crime had involved threats, rather than physical harm, and that he had no other criminal history.  Id. at 92-93.  The IJ found that Gahamanyi would continue to face grave dangers, were he removed to Rwanda,

even though he was no longer eligible for asylum.  Id. at 92.  The IJ also underscored

Gahamanyi's family connection to his wife, as well as Staton's inability to live in

Rwanda.  Id. at 93.  The IJ concluded that Gahamanyi's criminal conduct had been "an

aberration" and, "[c]onsidering all these factors in the aggregate, the Court believes

that this is one of these rare cases where it would be appropriate to exercise discretion

in favor of the respondent."  Id.  Having granted Gahamanyi's application for an

adjustment of status, the IJ did not consider his application for withholding of

removal.  Id. at 94.

On March 19, 2007, the Government filed an appeal of the IJ's decision, based

upon its contention that Gahamanyi had not established an "exceptional and extremely

unusual hardship," which would warrant a waiver of inadmissibility.  Id. at 62-64, 67.

More specifically, the Government argued that Gahamanyi did not show any remorse

for his criminal conduct.  Id. at 72.  With respect to Gahamanyi's marriage, the

Government argued that Gahamanyi and Staton knew, at the time of their marriage,

that Gahamanyi faced removal proceedings as a result of his conviction.[6]  Id.

Accordingly, the Government argued that Staton could not claim a hardship would

---

[6]According to the Respondent, Statton did not immediately file a Petition for Alien Relative on behalf of Gahamanyi.  See, A.R., supra at 70.

result if Gahamanyi were deported, since she had some expectation of that outcome at the time of their marriage.  Id.  In addition, the Government asserted that Staton had been financially independent, prior to the marriage, such that Gahamanyi's removal would not impose a financial hardship.  Id. at 73.  Lastly, the Government asserted that Gahamanyi did not claim any tribal affiliation, which undermined his asserted fears of ethnic persecution.  Id.

On June 13, 2007, the Board of Immigration Appeals (the "BIA") vacated the IJ's decision, and remanded the case for further proceedings.[7]  Id. at 99.  The BIA explained that, in Gahamanyi's case, the IJ had not required a showing of exceptional and extremely unusual hardship, because Gahamanyi had not caused any physical harm to his victims, and because the IJ found his behavior to be an aberration.  Id. at 100.  However, the BIA concluded that the IJ had clearly erred when he found that Gahamanyi was not a "violent or dangerous individual."  Id. at 101.

Although the BIA acknowledged the testimony, which "suggest[ed] that the respondent's criminal acts were anomalous," it held that the criminal conduct, for

---

[7]In the interim, on April 18, 2007, Gahamanyi received notice that Staton's Petition for Relative had been approved.  See, A.R., supra at 107.  Thereafter, on July 17, 2007, Gahamanyi submitted another application to adjust his status, and for a waiver of inadmissibility.  Id. at 108-116.

which Gahamanyi was convicted, was inherently dangerous, and that Gahamanyi "must be considered guilty of the crime for which he was lawfully convicted." Id. Accordingly, the BIA remanded the case to the IJ, for a consideration of whether Gahamanyi was entitled to a waiver of inadmissibility based upon a showing of exceptional and extremely unusual hardship, or whether Gahamanyi was entitled to withholding of removal. Id.

Following remand, on August 30, 2007, the IJ issued a decision, in which he granted Gahamanyi's application for a waiver of inadmissibility, and further granted his application for an adjustment of status. Id. at 117, 122. The IJ noted that Gahamanyi was seeking a waiver pursuant to Section 209(c), for humanitarian purposes and to assure family unity, as well as pursuant to Section 212(h), based upon the extreme hardship that Staton would face, were Gahamanyi removed. Id. at 132-133.

The IJ recited Staton's significant medical conditions, as well as her inability to accompany Gahamanyi to Rwanda, because of her need for treatment. Id. at 135. Based upon those medical conditions, the IJ concluded that Staton would suffer an exceptional and extremely unusual hardship, if Gahamanyi were removed to Rwanda, because her choice would be "either to go [to] a country where she would likely not

survive for an extended period of time or [to] encounter permanent separation from her husband." Id. In addition, the IJ found that Gahamanyi would suffer an exceptional and extremely unusual hardship, if he were removed, because he would be separated from Staton, and because he would return to a country "in which essentially all of his living family * * * were killed," and in which "he was detained himself and accused, wrongly, of participation in the genocide." Id. at 136.

Based upon those considerations, the IJ granted Gahamanyi's application for a waiver, and his application for an adjustment of status. Id. at 137. The IJ also considered, and denied, Gahamanyi's request for withholding of removal. Id. The IJ observed that conditions in Rwanda had improved since 2002, and he concluded that Gahamanyi would not likely be faced with persecution or torture, if returned to Rwanda. Id.

On September 6, 2007, the Government filed an appeal of the IJ's decision to the BIA. Id. at 118-121, 141. The Government again argued that Gahamanyi had failed to establish an exceptional and extremely unusual hardship, which would support a waiver of inadmissibility. Id. at 120. More specifically, the Government renewed its argument that, at the time of their marriage, both Staton and Gahamanyi were aware that he might face deportation. Id. at 142, 148-49, citing Matter of

Cervantes-Gonzales, 22 I&N Dec. 560, 567 (BIA, March 11, 1999), aff'd sub nom. Cervantes-Gonzales v. INS, 244 F.3d 1001 (9th Cir. 2001), and Salas-Velasquez v. INS, 34 F.3d 705, 709 (8th Cir. 1994).  The Government further argued that the IJ erred in exercising favorable discretion, when Gahamanyi failed to accept responsibility, or to demonstrate any remorse for his criminal conduct. Id. at 120, 148, citing Matter of Mendez, 21 I&N Dec. 296, 304-305 (BIA, April 12, 1996) ("[R]ehabilitation or the lack thereof is a factor to be considered in the exercise of discretion, and it may be ultimately determinative in some cases.").

On December 14, 2007, the BIA sustained the Government's appeal, and held that the IJ had erred in granting an adjustment of status. See, Gahamanyi v. Mukasey, Eighth Circuit Docket No. 08-1616, Administrative Record ("Appellate Record") at pp. 31-32.[8]  Specifically, the BIA concluded that Gahamanyi had failed to establish extraordinary circumstances, as required in order to obtain a discretionary waiver of inadmissibility, given his status as a "violent or dangerous individual" -- a determination which Gahamanyi had not appealed following the BIA's earlier

---

[8]"[F]ederal courts may sua sponte take judicial notice of proceedings in other courts if they relate directly to matters at issue." Conforti v. United States, 74 F.3d 838, 840 (8th Cir. 1996), quoting Hart v. C.I.R., 730 F.2d 1206, 1207 n. 4 (8th Cir. 1984).

decision.  Id. at p. 32 and n. 1.  Accordingly, the BIA held that Gahamanyi's circumstances did not warrant a waiver of inadmissibility.  Id. at p. 33.  As a result, Gahamanyi was ineligible for an adjustment of status, and the BIA ordered his removal to Rwanda.  Id.

The Government promptly filed a Motion for Reconsideration with the BIA. Id. at p. 26.  The Government asked the BIA to separately consider, and deny, Gahamanyi's application for an adjustment of status, based upon Staton's Petition for Alien Relative.  Id. at p. 27.  In response, Gahamanyi filed a cross-Motion for Reconsideration, in which he asked the BIA to conclude that he was entitled to an adjustment of status, based upon a finding of exceptional and extremely unusual hardship, owing to his wife's medical conditions, and the "abysmal" human rights conditions in Rwanda.  Id. at pp. 8, 12, 15.

Thereafter, on February 20, 2008, the BIA issued a supplemental decision, in which it denied Gahamanyi's Motion for Reconsideration, as untimely and without merit.  Id. at pp. 2-3.  The BIA further granted the Government's Motion for Reconsideration, and denied Gahamanyi's application for adjustment, based upon his marriage to Staton.  Id. at p. 3; see also, INA §245, Title 8 U.S.C. §1255.  The BIA reasoned that a violent or dangerous individual could not obtain a waiver of

inadmissibility, pursuant to Section 212(h) of the INA, without a showing of extreme hardship to his or her spouse.  Id.; see also, INA §212, Title 8 U.S.C. §1182.

Since the standard for such a waiver is "essentially the same as the standard set forth under section 209(c)" of the INA, the BIA concluded that Gahamanyi had not demonstrated a sufficient hardship to warrant a waiver, for the same reasons that he had not shown a sufficient hardship for a waiver pursuant to Section 209, as outlined in its earlier decision of December 14, 2007.  Id.  Accordingly, the BIA concluded that Gahamanyi was ineligible for an adjustment of status, under either Section 209 or Section 212.  Id.

On March 19, 2008, Gahamanyi filed a Petition for Review of the BIA's decision with our Court of Appeals, as well as a Motion for a Stay of Removal pending his appeal.  See, Gahamanyi v. Mukasey, Eighth Circuit Docket No. 08-1616, available online at http://ecf.ca8.uscourts.gov; see also, INA §242(a)(5), Title 8 U.S.C. §1252(a)(5)(granting Federal Courts of Appeals the sole jurisdiction to review Order of Removal).  On April 29, 2008, our Court of Appeals denied Gahamanyi's Motion for a Stay and, on May 30, 2008, it denied his request for reconsideration.  Id. Following several extensions of the briefing schedule, at the request of both parties,

Gahamanyi's appeal was fully briefed and submitted as of July 28, 2008, and it continues to pend before the Court of Appeals.  Id.

In his Federal Habeas Petition, which he filed on September 18, 2007, Gahamanyi asserts that "ICE has taken an unreasonable time to complete removal proceedings in violation of [INS §236(c), Title] 8 U.S.C. §1226(c) and that his continued detention pending completion of his removal proceedings denies his Fifth Amendment due process rights."  See, Petitioner's Reply, Docket No. 13, at p. 1; see also, Petition for Writ of Habeas Corpus, Docket No. 1, at p. 3.  Notably, the Habeas Petition was filed just weeks after the Government filed its second appeal with the BIA, following the IJ's decision of August 30, 2007.  As previously detailed, since the filing of the Habeas Petition, the BIA has sustained the Government's appeal, and Gahamanyi's appeal of the BIA's Order is now pending before our Court of Appeals.

We turn to address Gahamanyi's claim.

### III.  Discussion

A.   Standard of Review.  "[W]hen an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')."  INA §241(a)(1)(A), Title 8 U.S.C. §1231(a)(1)(A).

- 18 -

The removal period begins on the latest of the following:

> (i)   The date the order of removal becomes administratively final.
>
> (ii)  If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
>
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

INA §241(a)(1)(B), Title 8 U.S.C. §1231(a)(1)(B).

Detention is mandatory during the ninety (90) day removal period.  See, INA §241(a)(2), Title 8 U.S.C. §1231(a)(2).

An alien's detention may continue beyond the removal period, at the discretion of the Attorney General, when removal has not been effected within ninety (90) days. See, INA §241(a)(6), Title 8 U.S.C. §1231(a)(6); Zadvydas v. Davis, 533 U.S. 678, 682 (2001); see also, Title 8 C.F.R. 241.4(c)(1) (delegating authority to INS District Directors to make initial custody determinations, as well as subsequent determinations, during 90-day removal period and 90-day post-removal-period). Although the Attorney General -- and, by delegation, the INS -- has the discretion to detain an alien beyond the removal period, that continued detention is subject to the

limits of the Fifth Amendment's Due Process clause.  See, Zadvydas v. Davis, supra at 690-692.

In Zadvydas v. Davis, the Supreme Court rejected, as unconstitutional, the Government's argument that the Attorney General has discretion to detain indefinitely an alien subject to a final Removal Order.  Id. at 689, 692 ("The serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any [procedural] protection is obvious.").  Instead, the Supreme Court read a temporal limitation into INA §241(a)(6), Title 8 U.S.C. §1231(a)(6), and held that, although detention beyond the 90-day removal period was permitted by statute, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." Zadvydas v. Davis, supra at 699 (citation omitted).

The Zadvydas Court contemplated that the determination of whether removal was "reasonably foreseeable" would be made in consideration of an alien's Petition for Habeas relief under Title 28 U.S.C. §2241.  See, Zadvydas v. Davis, supra at 699 (citing Title 28 U.S.C. §2241(c)(3) as the Courts' authority to determine whether detention is "in violation of the Constitution or laws or treaties of the United States").

- 20 -

A Habeas Petition under Section 2241, however, may not be used to seek review of an Order of Removal in a Federal District Court:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, * * * a petition for review filed with an appropriate **court of appeals** in accordance with this section shall be the **sole and exclusive means** for judicial review of an order of removal entered or issued under any provision of this chapter[.]

INA §242(a)(5), Title 8 U.S.C. §1252(a)(5)[emphasis added].

Thus, this Court may not consider the merits of the BIA's final Removal Order in this proceeding. Nonetheless, under the holding of Zadvydas, a Federal District Court has jurisdiction to entertain a Petition for Habeas relief when an alien, who is subject to a final Order of Removal, challenges only his continued detention. See, Bah v. Cangemi, 489 F. Supp.2d 905, 914 n. 9 (D. Minn. 2007); Moallin v. Cangemi, 427 F. Supp.2d 908, 921 (D. Minn. 2006)(collecting cases).

In considering whether an alien's continued detention violates the Constitution, "if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." Zadvydas v. Davis, supra at 699-700. In Zadvydas, the Supreme Court recognized that it was presumptively reasonable for the INS to detain an alien for six (6) months following a final Removal

Order -- i.e., for the initial ninety (90) day removal period, plus another ninety (90) days. Id. at 701; see also, Bah v. Cangemi, supra at 917.  "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."  Id.

B.    Legal Analysis.  As we have noted, Gahamanyi first filed his Habeas Petition on September 18, 2007, after approximately seven (7) months of detention. See, Petition, supra.  At the time the Petition was filed, the Government's second appeal to the BIA was pending, but had not yet been briefed or considered.  See, Response to Petition, Docket No. 11, at p. 6.  Since that time, on December 14, 2007, the BIA sustained the Government's appeal, denied Gahamanyi's request for an adjustment of status pursuant to Section 209(c), and ordered Gahamanyi's removal to Rwanda.  See, Appellate Record, supra at pp. 31-33.  On February 20, 2008, the BIA issued a supplemental Order, in which it further denied Gahamanyi's request for an adjustment of status pursuant to Section 212(h).  Id. at pp. 2-3.  On March 19, 2008, Gahamanyi filed an appeal with our Court of Appeals, and on April 29, 2008, his Motion for a Stay of Removal was denied.  See, Gahamanyi v. Mukasey, supra.

As we have explained, the ninety (90) day removal period begins to run on the latest of three possible dates:  (1) the date of a final Removal Order; (2) if a Court orders a Stay of removal in order to permit judicial review of a Removal Order, the date of that Court's final Order; or (3) if the alien is detained on non-immigration grounds, the date the alien is released from such detention.  See, INA §241(a)(1)(B), Title 8 U.S.C. §1231(a)(1)(B).  Here, the Removal Order became effective, and final, when the BIA sustained the Government's appeal on December 14, 2007.  See, INA §241(a)(1)(B)(i), Title 8 U.S.C. §1231(a)(1)(B)(i).  Our Court of Appeals denied Gahamanyi's Motion for a Stay of Removal, and therefore, the start of his removal period was never deferred from December 14, 2007.  See, INA §241(a)(1)(B)(ii), Title 8 U.S.C. §1231(a)(1)(B)(ii).

Accordingly, on September 18, 2007, when his Habeas Petition was filed, Gahamanyi remained in pre-removal detention, pursuant to INA §236, Title 8 U.S.C. §1226, which governs an alien's detention during removal proceedings.  In Demore v. Kim,  538 U.S. 510, 517 (2003)[emphasis added], the Supreme Court considered a constitutional challenge to Section 236(c), which "mandates detention **during** removal proceedings for a limited class of deportable aliens -- including those convicted of an aggravated felony."  The Habeas petitioner, who was there detained

as a criminal alien, asserted that the statute violated the Fifth Amendment Due Process clause by permitting his detention during removal proceedings without an individualized determination of his flight risk or dangerousness -- that is, because the statute mandated detention for all criminal aliens within the statutorily-defined class. Id. at 514, 523, 528.  The Court rejected that contention, finding that Congress was "justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," and that, therefore, those criminal aliens may "be detained for the brief period necessary for their removal proceedings."  Id. at 513.

In reaching its conclusion, the Court distinguished the Due Process concerns identified in Zadvydas in two respects.  First, the Court found that detention of deportable criminal aliens during removal proceedings, pursuant to INA §236(c), Title 8 U.S.C. §1226(c), "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings."  Demore v. Kim, supra at 528.  By contrast, the post-removal-period detention at issue in Zadvydas, pursuant to Section 1231, "no longer [bore] a reasonable relation to the purpose for which the individual was committed," once removal is no longer reasonably foreseeable.  Demore v. Kim, supra at 527.

- 24 -

Second, the <u>Demore</u> Court found that, "[w]hile the period of detention at issue in <u>Zadvydas</u> was 'indefinite' and 'potentially permanent,' * * * the detention here is of a much shorter duration." <u>Demore v. Kim</u>, supra at 528 (internal citation omitted). The Court found that "the detention at stake under §1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal."[9] <u>Id.</u> at 530 (footnote omitted). Moreover, the Court noted that detention under INA §236(c), Title 8 U.S.C. §1226(c), has "a definite termination point," <u>id.</u> at 529, which is the conclusion of removal proceedings. Thus, the Court rejected the Due Process challenge to the pre-removal-period detention of criminal aliens.

Notwithstanding the Court's conclusion in <u>Demore</u>, at least one Court has since read a temporal limitation into pre-removal-period detention, under INA §236(c), Title 8 U.S.C. §1226(c). See, <u>Ly v. Hansen</u>, 351 F.3d 263, 270 (6th Cir. 2003)("[T]he INS may detain prima facie removable aliens for a time **reasonably required** to complete removal proceedings in a timely manner.")[emphasis added]; see also, <u>Bah v. Cangemi</u>, supra at 919 (collecting cases that have found constitutional limits on a

---

[9]In <u>Demore v. Kim</u>, 538 U.S. 510, 530 (2003), by comparison, the alien had been detained for six (6) months during his removal proceedings, but the Court noted that the alien "himself had requested a continuance of his removal hearing."

Section 1226 detention); cf., <u>Mullings v. Chertoff</u>, 2007 WL 1723469 at *4 n. 3 (D.N.J., June 12, 2007)("[T]he discretionary power of the Attorney General [pursuant to §1226(a)] has only one temporal limitation, namely, the conclusion of removal proceedings.").

Here, Gahamanyi filed his Habeas Petition when he had been in pre-removal detention for approximately seven (7) months.  See, <u>Petition</u>, supra.  However, in the interim, the BIA issued its decision on the Government's appeal, and our Court of Appeals denied Gahamanyi's Motion for a Stay.  Accordingly, Gahamanyi is now in post-removal detention, and any claim, insofar as it concerns his pre-removal detention, has become moot.  See, <u>Pyne v. U.S. Dep't of Homeland Security</u>, 2008 WL 940163 at *2 (D.N.J., April 7, 2008)("Because Petitioner is no longer detained pursuant to §1226(c), as he was at the time he filed this Petition, and because he has asserted no challenge to his post-removal order detention pursuant to §1231(a)(2), the challenge to his pre-removal order detention has become moot."); <u>Reyes-Cardenas v. Gonzales</u>, 2007 WL 1290141 at *2 (S.D.N.Y., April 30, 2007).  Therefore, we turn to consider whether we can determine, on this Record, if Gahamanyi's post-removal detention has exceeded constitutional limits.  Compare, <u>Ali v. Cangemi</u>, 2004 WL 4000530 at *10 (D. Minn., June 1, 2004)(where <u>Zadvydas</u> claim ripened while action

was pending, "this Court can see no good reason to dismiss this action without prejudice on the grounds of pre-maturity" because, "[i]f the Court were to do that, Petitioner would undoubtedly file a new petition immediately, and his now ripe Zadvydas claims would have to be addressed on the merits."), vacated on other grounds, 419 F.3d 722 (8th Cir. 2005); with Akinwale v. Ashcroft, 287 F.3d 1050, 1052 (11th Cir. 2002)(Habeas Petition should be dismissed as premature unless alien has been detained in excess of six (6) months at time of filing); Majoa v. Watson, 2008 WL 2852416 at *2 (N.D. Tex., July 9, 2008)(dismissing Habeas Petition as premature when filed); Ba v. Gonzales, 2008 WL 2157073 at *2 (N.D. Fla., May 19, 2008)(same).

As we have noted, here, the Removal Order became effective, and final, when the BIA sustained the Government's appeal on December 14, 2007. Our Court of Appeals denied Gahamanyi's Motion for a Stay of Removal, and therefore, the start of his removal period was never deferred from December 14, 2007. Accordingly, Gahamanyi's ninety (90) day removal period expired on March 13, 2008, and his

ninety (90) day post-removal-period, under <u>Zadvydas</u>, expired on June 11, 2008 --

more than three (3) months ago.[10]

Nonetheless, on this Record, we cannot conclude that Gahamanyi's Habeas

Petition asserts a valid Due Process claim.  Under <u>Zadvydas</u>, it is not enough to show

that an alien's post-removal detention has exceeded six (6) months -- instead, the alien

must "provide[] good reason to believe that there is no significant likelihood of

---

[10]In his reply brief to the Eighth Circuit Court of Appeals, Gahamanyi argues that the BIA's supplemental Order of February 20, 2008, is the "administratively final" decision, rather than the BIA's Order of December 14, 2007.  See, <u>Gahamanyi v. Mukasey</u>, supra, Petitioner's Reply Brief at p. 2; compare, <u>Liadov v. Mukasey</u>, 518 F.3d 1003, 1006 (8th Cir. 2008)("A BIA order denying reconsideration is reviewable as a final order of removal."), citing <u>Esenwah v. Ashcroft</u>, 378 F.3d 763, 765 (8th Cir. 2004), cert. denied, 544 U.S. 962 (2005).  However, Federal Regulations state that "the filing of * * * a motion to reconsider shall not stay the execution of any decision made in the case," and the "[e]xecution of such decision shall proceed unless a stay of execution is specifically granted by the [BIA]."  <u>Title 8 C.F.R. §1003.2(f)</u>; see also, <u>White v. INS</u>, 6 F.3d 1312, 1317 (8th Cir. 1993)("Nowhere in the INA or its regulations is there any indication that a motion to reopen or reconsider, regardless of when it is filed or decided, has a bearing on the finality of a deportation order.")(citing to 1993 edition of the Code of Federal Regulations), cert. denied, 511 U.S. 1141 (1994).

Accordingly, because the BIA did not stay the execution of its Order of December 14, 2007, the removal period would have begun on that date.  Nonetheless, even if we were to measure the time from February 20, 2008, Gahamanyi's ninety (90) day removal period expired on May 21, 2008, and his ninety (90) day post-removal period expired on August 19, 2008 -- approximately one (1) month ago.  As a result, we need not determine which Order is "administratively final," as the <u>Zadvydas</u> claim has now ripened under either measure.

removal in the reasonably foreseeable future[.]"   Zadvydas v. Davis, supra at 701; see

also, Kanteh v. Ridge, 2005 WL 1719217 at *3 (D. Minn., June 30, 2005)("[T]he alien

has the initial burden of showing no significant likelihood of removal in the

reasonably foreseeable future."). Gahamanyi makes no such showing here,[11] and we

are unable to conclude that his removal is unlikely to occur in the reasonably

foreseeable future, on the Record that has been presented here. Compare, Nor v.

Baniecke, 2006 WL 1517770 at *6 (D. Minn., May 26, 2006)(granting Habeas

Petition, where the petitioner argued "that there is a significant likelihood that the

government will not be able to remove him due to the instability in Somalia and the

lack of a centralized government," and the Government failed to rebut that assertion).

Therefore, Gahamanyi has not met his burden, under Zadvydas, and we recommend

that his Petition be denied.

However, we recognize that, since the Habeas Petition was originally filed, the

procedural posture of Gahamanyi's underlying immigration action has advanced

appreciably.  Accordingly, we recommend that the Petition be denied without

---

[11]Moreover, if Gahamanyi were to make such a showing, the Government would be provided with an opportunity to "respond with evidence sufficient to rebut that showing." Zadvydas v. Davis, 533 U.S. 678, 701 (2001); Jaiteh v. Gonzales, 2008 WL 2097592 at *2 (D. Minn., April 28, 2008).

prejudice, in order that Gahamanyi will be free to file another Habeas Petition, if circumstances develop, such that he is able to support a constitutional claim, pursuant to Zadvydas.  See, Jaiteh v. Gonzales, 2008 WL 2097592 at *3 (D. Minn., April 28, 2008)("Should [the petitioner's] removal be further delayed, however, his continued detention may become unreasonable and thus violate due process," "[s]o this ruling should be without prejudice to his right to bring, on newly developed facts, another petition for a writ of habeas corpus."); see also, Barenboy v. Attorney General, 160 Fed.Appx. 258, 261 (3rd Cir. 2005)(same);  Monioudis v. Chertoff, 2007 WL 121433 at *5 (D.N.J., January 11, 2007)(same).

NOW, THEREFORE, It is --

RECOMMENDED:

That the Petition for Writ of Habeas Corpus [Docket No. 1] be denied, but without prejudice.


Dated:  October 17, 2008                    s/Raymond L. Erickson
                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE

- 30 -

NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than November 3, 2008,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than November 3, 2008,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.